**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **SHERYL BETH SIEGEL,** | ) | **CASE NO. 1:13CV1626** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE SOLOMON OLIVER** |
| **v.** | ) | **Magistrate Judge George J. Limbert** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | <u>**Report and Recommendation of**</u> |
| **COMMISSIONER OF** | ) | <u>**Magistrate Judge**</u> |
| **SOCIAL SECURITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

Sheryl Beth Siegel ("Plaintiff") seeks judicial review of the final decision of Carolyn W. Colvin ("Defendant"), Commissioner of the Social Security Administration ("SSA"), denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). ECF Dkt. #1.  For the following reasons, the undersigned recommends that the Court REVERSE the Commissioner's decision and REMAND the instant case:

**I.**  <u>**PROCEDURAL AND FACTUAL HISTORY**</u>

On March 27, 2009, Plaintiff filed applications for DIB and SSI, alleging disability beginning September 30, 2008.  Tr. at 158-178.  The SSA denied Plaintiff's applications initially and on reconsideration.  *Id*. at 104-136.  Plaintiff filed a request for an administrative hearing and on November 8, 2011, an ALJ conducted an administrative hearing where Plaintiff was represented by counsel.  *Id*. at 42, 135.  At the hearing, the ALJ heard testimony from Plaintiff and a vocational expert ("VE").  *Id*. at 42.  On December 19, 2011, the ALJ issued a decision denying Plaintiff benefits.  *Id*. at 25-35.  Plaintiff filed a request for review of the decision and on July 25, 2012, the Appeals Council denied the request for review.  *Id*. at 1-4, 20-21.

On July 26, 2013, Plaintiff filed the instant suit seeking review of the ALJ's decision.  ECF Dkt. #1.  On January 15, 2014, Plaintiff filed a brief on the merits.  ECF Dkt. #16. Defendant filed a brief on the merits on March 14, 2014.  ECF Dkt. #18.

**II.**  <u>**SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION**</u>

On December 19, 2011, the ALJ issued a decision first finding that Plaintiff had not engaged

in substantial gainful activity since September 30, 2008, her alleged onset date.  Tr. at 27.  The ALJ cited Plaintiff 's testimony that she worked after her alleged onset date selling jewelry and as a taxicab driver and she drove a taxi three days per week for 13-hour shifts and earned $75-$100 per shift.  *Id*.  He also noted her testimony that she made jewelry to sell at shows.  *Id*.  However, he determined that while this was above the level of substantial gainful activity, Plaintiff's vague testimony led him to proceed onward in the sequential analysis and he was not going to find her not disabled because she engaged in substantial gainful activity.  *Id*. at 28.  The ALJ did note that Plaintiff's abilities to perform such work at substantial gainful activity levels during her alleged disability date was an important consideration for credibility purposes in his decision.  *Id*.

The ALJ proceeded to Step Two of the sequential evaluation and found that Plaintiff's impairments of osteoarthritis, degenerative joint disease ("DJD") in the knees, cervical degenerative disc disease ("DDD"), mood disorder, cannabis abuse in remission, and Sjogren's syndrome were severe impairments under 20 C.F.R. §§ 404.1520(c) and 416.920(c).  Tr. at 28.  The ALJ further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926  ("Listings").  *Id*. at 14.

The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b) and 416.967(b), with the abilities to lift, carry, push and pull twenty pounds occasionally and ten pounds frequently, sit and stand/or walk for six hours in a normal workday, and she could occasionally climb, but she was limited to simple, routine tasks that did not involve arbitration, negotiation, confrontation, directing the work of others, being responsible for the safety or welfare of others, no strict production quotas, no piece rate work or assembly line work and she could engage in only superficial interaction with others.  Tr. at 30. The ALJ ultimately concluded that, although Plaintiff could not perform her past relevant work, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform, including the representative occupations of housekeeping cleaner, mail clerk not within the United States Postal Service, and food service worker.  *Id*. at 34.  As a consequence, the ALJ found that Plaintiff had not been under a disability as defined in the SSA and was not entitled to benefits.

-2-

### III.    STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to SSI and DIB benefits.  These steps are:

1.    An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2.    An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3.    If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4.    If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5.    If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992).  The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step.  *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

### IV.    STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability.  This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g).  Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards.  *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citations omitted). An ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted). The Court cannot reverse the decision of an ALJ, even if substantial evidence exists in the record that could have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 528 (6th Cir.1997).

## V.     RELEVANT MEDICAL EVIDENCE

As Defendant points out, Plaintiff does not challenge any of theALJ's findings concerning her mental functioning. ECF Dkt. #18 at 3. Accordingly, Defendant does not recite the medical evidence concerning Plaintiff's mental functioning. A review of Plaintiff's brief confirms that she does not raise issues concerning her mental conditions. Accordingly, the undersigned only reviews the medical evidence concerning Plaintiff's physical impairments.

On February 1, 2008, Plaintiff presented to the Cleveland Clinic complaining of a sore throat and body aches over the last three months. Tr. at 306. She was diagnosed with cervicalgia and acute pharyngitis. *Id.* at 308. Blood tests were performed and a cervical x-ray was ordered. *Id.* The cervical x-ray showed DDD at C3/C4 and osteophyte formation of multiple endplates in the lower cervical spine. *Id.* at 313. There were also degenerative changes of the facet joints at multiple levels and mild narrowing of multiple foramens at multiple levels bilaterally. *Id.* Based upon abnormal blood test results, Plaintiff was referred to a rheumatologist. *Id.* at 310-312, 315.

Dr. Manzon, a rheumatologist, examined Plaintiff on February 11, 2008 for her diffuse pain with acute phase reactants and positive ANA blood test result. Tr. at 329. She noted Plaintiff's past medical history as including migraines and irritable bowel syndrome. *Id.* Plaintiff relates that her pain had been present since November of 2007 when she woke up one morning with lower back pain radiating to her left leg, leg shoulder blade and left arm. *Id.* at 330. She then developed stiffness,

-4-

hand swelling and malaise.  *Id*.  Plaintiff reported that three days prior to her visit with Dr. Manzon, she woke up with horrendous pain in her hands and arms, as well as leg pain.  *Id.*  She also related symptoms such as headaches and stammering.  *Id.*  She stated that she went to the emergency room and the doctor gave her Vicodin, but she was done with the prescription.  *Id.*  Plaintiff told Dr. Manzon that the only place on her body without pain was her abdomen and right ankle and the worst pain was in her left arm as she was unable to lift it.  *Id.*  She reported that she has tried Naproxen, Advil, heat and epsom salts, as well as Medrol Dosepak.  *Id*.

Plaintiff reported that she has had fatigue throughout her life, she had lost twenty to thirty pounds since November of 2007 and she had chills, fatigue, dry eyes and mouth, tinnitus, arm swelling, and a history of Bell's palsy with facial droop that had resolved.  Tr. at 330-331.  Upon examination, Dr. Manzon found 16/18 tender points, exquisite tenderness of the entire left arm with no swelling, but pain with active and passive range of motion in the wrist, elbow and shoulder.  *Id*. at 332.  There was also tenderness over the left posterolateral neck pectoral and scapular region with no visible abnormalities.  *Id*.  Plaintiff also had tenderness in her right wrist with no pain, tenderness over her right shoulder with no pain and normal range of motion, and no pain in her neck or knees.  *Id*.  She also had precussion tenderness over her lower spine and strength testing was limited due to pain.  *Id*. at 333.  Plaintiff had a normal gait and normal muscle tone.  *Id.*

Dr. Manzon found that while Plaintiff's presentation was not typical for a system inflammatory disorder, her abnormal blood test results and response to glucocorticosteroids warranted further evaluation.  Tr. at 333.  She ordered a number of blood tests and x-rays and prescribed Darvocet for Plaintiff.  *Id*.  Blood test results showed some abnormalities and X-rays showed mild bilateral triscaphe degenerative arthritis of the hands, and moderate yield compartment joint space narrowing bilaterally with subchondral sclerosis and osteophytes consistent with DJD of the knees.  *Id*. at 335-337.

On February 26, 2008, Plaintiff presented to Dr. Manzon who reviewed Plaintiff's test results and clinical history and diagnosed myalgia and myositis, not otherwise specified, joint pain in multiple joints, elevated sediment rate, and anemia, not otherwise specified.  Tr. at 356.  She had given Plaintiff a trial of Prednisone, which Plaintiff reported improved her symptoms only 20 to 30

percent  *Id*. at 355.  Dr. Manzon contemplated whether Plaintiff had fibromyalgia.  *Id*.  She also prescribed Amitriptilyne, refilled the Darvocet and continued Naproxen for Plaintiff.  *Id.* at 356-357. An x-ray of Plaintiff's knees showed moderate yield compartment joint space narrowing bilaterally with subchondral sclerosis and ostephytes.  *Id*. at 367.  Patellofemoral joint was narrowed mildly bilaterally.  *Id*.  The radiologist found that the findings were consistent with DJD.  *Id*.

On March 27, 2008, Plaintiff followed up with Dr. Manzon and she listed presumed diagnoses of presumed undifferentiated connective tissue disease ("CTD") and fibromyalgia due to manifestations of diffuse pain, headaches, fatigue and weight loss of twenty to thirty pounds since November of 2007.  Tr. at 320, 347.   She reviewed the abnormal blood test results and indicated that since Plaintiff was back on Prednisone, she reported that her pain was 80 percent improved.  *Id*. The blood test results showed a positive ANA, elevated acute phase reactants and anemia.  *Id*.  Dr. Manzon started Plaintiff on Plaquenil.  *Id*.

On January 17, 2010, Plaintiff presented to the emergency room after falling and sustaining an injury to her right wrist.  Tr. at 417.  X-rays showed no acute fracture, but joint space narrowing in the first and second metacarpal carpal joint space compatible with early arthritic disease.  *Id*.

On January 20, 2010, Plaintiff presented to Dr. Cohn, an orthopedic surgeon, for her right wrist pain.  Tr. at 433.  She explained that she had fallen on a sidewalk while picking up someone as a cab driver.  *Id*.  She related that she went to the emergency room and they splinted her wrist, but she had to take it off because she was not able to drive with it.  *Id*.  She reported tingling and numbness up into the arm and indicated that her right hand and wrist were both painful with motion. *Id.* Dr. Cohn's examination revealed tenderness over the right hand and wrist and he diagnosed right hand contusion and sprain/strain of the right wrist.  *Id*. at 434.  He ordered x-rays which showed no fracture of the right wrist or the right hand.  *Id*. at 440-441.  He prescribed Naprosyn and a cock-up wrist splint.  *Id*. at 435.

On March 29, 2010, Plaintiff followed up with Dr. Cohn for her right wrist and hand pain. Tr. at 431.  She denied numbness and tingling but stated that her right middle fingers stuck and her left ring finger would not straighten.  *Id*.  Upon examination, Dr. Cohn noted tenderness over the right third A-1 pulley of the right hand with triggering and locking and pain to forced extension of

-6-

the finger.  *Id.*  As to the left hand, Dr. Cohn noted less tenderness of the fourth A-1 pulley with a small nodule, but no triggering and Plaintiff was not able to fully straighten her fourth finger, but she had no pain when extension was forced.  *Id.*  Dr. Cohn diagnosed right third traumatic trigger finger and left fourth traumatic trigger finger.  *Id.*  He prescribed Voltaren for Plaintiff to apply to her fingers three times per day.  *Id.* at 432.

On July 14, 2010, Plaintiff underwent a disability evaluation by agency examining physician Dr. Gerblich for her impairments of lupus and migraine headaches.  Tr. at 444.  Upon examination, Dr. Gerblich diagnosed systemic lupus erythematosus ("SLE") and migraine headaches and concluded that Plaintiff had no limitations for sedentary activities.  *Id.* at 445.

On August 13, 2010, Dr. Caldwell completed a physical RFC form based upon Plaintiff's diagnoses of SLE and migraines and she concluded that Plaintiff could frequently lift up to ten pounds, occasionally lift up to twenty pounds, sit and stand/walk up to six hours per eight-hour workday, and push/pull with no limitations, occasionally climb ramps, stairs, ladders, ropes and scaffolds, and was limited bilaterally to frequent fine manipulation due to triggering in the fingers.  Tr. at 450-455.  She indicated that she was not giving great weight to Dr. Gerblich's conclusion that Plaintiff was limited to sedentary activities because Plaintiff's physical examination with him was normal except for a slight decrease in strength.  *Id.* at 456.  As support for her determination, she cited the January 2010 wrist x-ray showing normal results,  physical examinations showing pain with ranges of motion but normal grip strength, the triggering in two fingers and locking of one, a partial amputation of the right index finger, and Plaintiff's fatigue.  *Id.* at 451-452.

On September 15, 2010, Plaintiff underwent a CT scan of the head and sinuses due to complaints of headaches.  Tr. at 498.  No evidence of intercranial abnormality or sinus disease was found.  *Id.*

On October 14, 2010, Plaintiff presented to Dr. Ansevin for her complaints of headaches and difficulty speaking.  Tr. at 621.  Plaintiff reported a history of headaches and problems with her speech over the last 6-10 years where she talked backwards in episodes accompanied by a headache at times.  *Id.* at 622.  Dr. Ansevin diagnosed headaches, other speech disturbance and an unspecified thyroid disorder.  *Id.* at 625.  A brain MRI and blood work were ordered.  *Id.*  Dr. Ansevin's

impression was migraine headaches and no physiologic explanation for the speech complaints due to the frequency and uneventful prior evaluations. *Id*. The brain MRI showed nonspecific white matter T2 prolongation and an otherwise unremarkable brain MRI. *Id*. at 628.

On October 15, 2010, Plaintiff presented to Dr. Nixon complaining of a upper respiratory infection. Tr. at 616. Physical examination revealed no back pain on palpation and normal motor and sensory reflexes, as well as normal spinal range of motion and muscular strenght. *Id*. at 618. Plaintiff was prescribed Zithromax. *Id*.

Plaintiff presented to Dr. Wu on October 20, 2010 complaining of right back pain beginning four days prior that was so bad that she wanted to curl up in a ball. Tr. at 613. She explained that she went to the emergency room the night before and doctors diagnosed a urinary tract infection and gave her medicine. *Id*. Dr. Wu noted that Plaintiff was a self-employed model and an artist in jewelry. *Id.* She diagnosed right low back pain. *Id*.

On October 20, 2010, Plaintiff presented to Dr. Alvarado upon referral by Dr. Wu for Plaintiff's complaints of flank pain. Tr. at 602. Upon examination and testing, Dr. Alvarado diagnosed low back pain not related to trauma or weight lifting and he noted that the pain that Plaintiff referred to did not translate with his physical examination findings. *Id.* at 609. He further noted that Plaintiff's prior medications and tolerances for medications may be a consideration as she had been on pain medications before. *Id*. He also diagnosed microhematuria for many years and a non-obstructing 2 millimeter right renal stone in Plaintiff with no fever, no leucocytosis and negative urine culture. *Id*. He ordered lumber x-rays, prescribed Celebrex and suggested hydration and diet changes. *Id.*

X-rays of the lumbar spine showed degenerative facet arthritis on the left at L3 through L5, with well preserved disc spaces and vertebral bodies and possibly some narrowing of the disc space at L4/L5, mild lumbar dextroscoliosis maximum at L2/L3 and mild degenerative changes of both hip joints. Tr. at 611.

On November 1, 2010, Plaintiff presented to Dr. Ansevin for her complaints of headaches and difficulty speaking. Tr. at 598. Dr. Ansevin noted that Plaintiff had undergone a brain MRI which showed some nonspecific punctuate T2 weighted signal abnormalities in the white matter.

*Id*.  He explained to Plaintiff that this was most likely related to her history of tobacco abuse and migraine headaches.  *Id*.  Upon examination, Dr. Ansevin found that the examination was negative except for Plaintiff's complaints of stuttered speech which had been an ongoing complaint for years without change.  *Id*.  He found no limb weakness, numbness or tingling, and no fatigue, nausea, malaise or significant weight loss.  *Id*.  He diagnosed Plaintiff with anxiety and migraines.  *Id*.  He noted that Plaintiff was not happy with his diagnoses and would seek a second opinion.  *Id*. at 599-600.

On November 4, 2010, Plaintiff presented to her physician for follow up of her back pain.  Tr. at 594.  She indicated that she had started physical therapy for her back and needed an order for the physical therapy.  *Id*.  Dr. Wu listed Plaintiff's past medical history as including "[o]ther Forms of Migraine (food related), Irritable Bowel Syndrome (Irritable bowel), Unspecified Myalgia and Myositis, Throat Pain, Insomnia, Unspecified" and "Hematuria."  *Id*.  Dr. Wu diagnosed neck pain and prescribed physical therapy.  *Id*.

On December 6, 2010, Plaintiff self-referred to the Headache Center of the Cleveland Clinic for her headaches and speech difficulties.  Tr. at 784.  She reported a lifelong history of migraines since the age of 16 or 17 with associated neck pain or pain beginning in the left eye with radiation to the ear, sinus drainage, nausea and light sensitivity.  *Id*.  She indicated that Naproxen dulled the headache but gave her significant fatigue.  *Id*.  Dr. Stillman found a normal neurological examination, although Plaintiff reported joint pain in her hands, a dull headache over the left eye, and he found neck trigger points in the left suboccipital region.  *Id*. at 785-786.  He diagnosed migraines with auras in the form of word-finding abnormalities.  *Id*. at 786.  He prescribed Nadolol. *Id*.

On December 14, 2010, Plaintiff presented to the emergency room complaining of flank pain and nausea over the last two days.  Tr. at 535.  The clinical impression was a urinary tract infection. *Id*. at 536.

Plaintiff followed up at the Headache Center on March 18, 2011 and reported waking up with a daily headache and having fatigue during the day.  Tr. at 779.  She had gained seven pounds and reported that her stress level was high.  *Id*. at 780.  Physical examination revealed a normal cervical

range of motion and a normal neurological examination. *Id.* at 781. She was diagnosed with migraines without aura and possible sleep apnea. *Id.* A sleep study was ordered. *Id.* The sleep study showed no sleep apnea, but it did note snoring and hypersomnia, neither of which explained Plaintiff's daytime sleepiness and fatigue. *Id.* at 791.

On July 20, 2011, Plaintiff followed up at the Headache Center for her migraines, reporting that she was having up to twelve headaches per month. Tr. at 762. She indicated that they were mild to moderate in severity, but she did have some headaches since her last visit that were so severe that she almost passed out. *Id.* She had a normal physical and neurological evaluation and was diagnosed with migraine without aura. *Id.* at 764. Dr. Stillman noted that Plaintiff was not taking the Nadolol that he prescribed as directed which would help her with the feeling of passing out and he advised her to take in more liquids. *Id.*

On July 21, 2011, Plaintiff had a bone density scan which showed that she had osteopenia and was at an increased risk of fracture. Tr. at 776.

On August 3, 2011, Plaintiff was a passenger in a taxi that was stopped when it was rear-ended by another vehicle. Tr. at 984. She went to the emergency room complaining of headache, dizziness, left ear pain and neck pain. *Id.* at 974. A CT scan of the brain revealed no intracranial injury, and a cervical spine x-ray showed the same results as her February 1, 2008 x-ray: moderate endplate hypertrophic changes in the mid to lower cervical spine, particularly at C3-C4. *Id.* at 989-990. She was discharged with the diagnoses of headache with vertigo, head contusion, and neck strain and she was given medications. *Id.* at 975.

On August 5, 2011, Plaintiff presented to the emergency department for follow up from the car accident and complained of left-sided numbness and tingling in her left arm and leg. Tr. at 994. She reported that she had a sharp, throbbing pain in her neck diffusely that radiated to her left shoulder and arm. *Id.* Plaintiff was diagnosed with migraines and a concussion. *Id.* at 996. A brain CT scan with contrast and more elaborate cervical spine x-rays were performed which showed no abnormal findings. *Id.* at 998-1000.

On August 12, 2011, Plaintiff presented to the Headache Clinic indicating that the headache cocktail and occipital nerve block injections that she was given after her emergency room visit

-10-

provided significant improvement.  Tr. at 1095.  The infusion and nerve blocks made her head feel clearer and helped her speech changes.  *Id*.  Physical examination revealed tenderness to palpation of Plaintiff's cervical spine and trapezius as well as to the suboccipital area.  *Id.*  at 1096.  She was diagnosed with headaches, migraines without aura, headache due to neck or head trauma from the auto accident, and cervicalgia.  *Id*. at 1097.   Plaintiff was told to begin physical therapy, was prescribed medication, and was referred to psychology.  *Id*.

Plaintiff was referred to Westpark Occupational Medicine for physical therapy due to her continued pain and weakness.  Tr. at 1010.  She reported continuous bilateral shoulder pain, neck pain and left ankle pain.  *Id*. at 1020.  She started treatment on August 15, 2011 and had ten sessions from August 15, 2011 through September 22, 2011.  *Id*. at 1010-1019.  She reported unchanged symptoms.  *Id*. at 1010.

Plaintiff underwent an EMG on September 2, 2011 for complaints of low back pain and ankle pain.  Tr. at 1082.  It showed normal results and no radiculopathy, although a sensory radiculopathy could not be excluded.  *Id*.

On September 13, 2011, Plaintiff presented to Dr. Yao of the Cleveland Clinic Neurology Department for her dry eyes and mouth symptoms.  Tr. at 1038.  His impressions were Xerophthalmia, Xerostomia and an abnormal test result.  *Id*. at 1048.  He referred her to the dermatology and opthalmology departments to rule out Sjogren's Syndrome.  *Id*.

On October 6, 2011, a MRI of the cervical spine showed broad-based degenerative disc bulging at C2-C3 and prominent central disc protrusion indenting and deforming the ventral aspect of the cervical cord, with hyperintensity on the MRI suggesting a focal area of myelomalacia.  Tr. at 1026.  The MRI also showed broad-based degenerative disc bulging at C4-C5 with bilateral degenerative facet changes and moderate bilateral foraminal compromises, as well as broad-based degenerative disc bulging with bilateral degenerative facet changes at C5-C6 and broad-based degenerative disc bulging at C6-C7.  *Id*.

On October 14, 2011, Plaintiff presented to the Cardiology Department of the Cleveland Clinic reporting that she had Postural Orthstatic Tachycardia Syndrome ("POTS").  Tr. at 1074.  Plaintiff reported recurrent dizziness and lightheadedness. *Id*.  Dr. Jaeger noted a posturally provoked

increase in her heart rate and believed that she may have a component of underlying dysautonomia associated with her migraines and rheumatologic disorder.  *Id*. He ordered further testing.  *Id*. Plaintiff underwent a tilt table test that had to be stopped early because of her decrease in blood pressure and Plaintiff's request to do so due to symptoms that she was experiencing.  *Id*. at 1077-1078. The EKG that was ordered showed normal results.  *Id*. at 1085.  The stress test that was ordered also revealed normal results.  *Id*. at 1088.  Dr. Jaeger indicated in a letter dated January 16, 2012 that the tilt table test revealed very abnormal results suggestive of a vasodepressor response. *Id*. at 1111.

Based upon the testing that he ordered, Dr. Jaeger found some evidence of autonomic dysfunction, possible hypovolemia, and mild venous pooling with persistent orthostatis and orthostatic tachycardia.  *Id*.  He recommended that Plaintiff wear compression stockings, enroll in an exercise therapy program, elevate her head while sleeping, stop caffeine and tobacco use, and stop some of her medications.  *Id*. at 1112.  He also recommended a consultation with autonomic neurology. *Id*.

On October 24, 2011, Plaintiff was diagnosed with Sjogren's Syndrome.  Tr. at 1037.

A November, 18, 2011 cervical x-ray showed minimal grade one anterolisthesis of C6 on C7 which was not changed with flexion or extension, minimal anterolisthesis of C2 on C3 and C4 on C5 with flexion which reduced in extension, multilevel anterior osteophytes most prominent at C3-C4 and C6-C7 and mild multiple level facet degenerative changes bilaterally.  Tr. at 1116.  She was diagnosed with degenerative changes and minimal spondylolistesis.  *Id*.

Medical records after the date of the ALJ's decision show that on March 26, 2012, a cervical MRI showed that Plaintiff had a mildly progressing broad disc osteophyte complex causing mild to moderate cord compression and canal stenosis, stable moderate left and mild right foraminal stenosis and stable cord contusion/myelomalacia.  Tr. at 1099.  Dr. Schaefer, an orthopedist, indicated in a March 28, 2012 treatment note that he would support Plaintiff's application for social security benefits because he believed that it was probable that Plaintiff "will be unemployable" for at least twelve months due to the most recent cervical MRI, coupled with her post-surgical and degenerative changes in her feet and ankles and her chronic headaches.  *Id*. at 1097.  He explained that he personally reviewed Plaintiff's March 26, 2012 MRI and could "clearly see central disc protrusion

-12-

at C3-4 with nearly complete compression of the surrounding CSF and deformity of the cord, but the intrinsic cord signal is still small-1 cm just above and right of C3-4 disc." *Id.* at 1097.  He diagnosed cervical disc protrusion with myelopathy and opined that Plaintiff's car accident caused the C3-4 disc protrusion and thus the spinal cord myelopathy.  *Id*. at 1098.  He also opined that the car accident aggravated the pre-existing spondylosis at Plaintiff's C4-C5 through C6-C7 levels.  *Id*.  He noted that Plaintiff had a cervical surgery scheduled with Dr. Orr in the next five weeks and he was going to call that office to see if it could be moved up because he believed that a cervical decompression and fusion surgery was necessary.  *Id.*

Medical records postdating the ALJ's decision also indicate that a possible overlap existed between Plaintiff's vestibular disturbance, her cervical and thoracic spine mechanics, her migraines, orthostatic intolerance and possible occipital nerve irritation.  Tr. at 1188.  Dr. Cherian, the otoneurologist who suggested such an overlap, suggested cervical physical therapy, headache infusion therapy three times per week, and the taking of magnesium.  *Id*.  He surmised that on physical examination, he was able to provoke a component of patient dizziness upon neck vibration and he opined that neck issues may have been complicated by occipital nerve irritation on the left, which all   would exacerbate a tendency toward migraines, which would then influence the neurocardiac axis which pushed Plaintiff toward orthostatic intolerance.  *Id*.

## VI.   ANALYSIS

### A.   STEP ONE

Plaintiff first asserts that while the ALJ found at Step One of the analysis that she had not engaged in substantial gainful activity, he erroneously used the fact that that she worked as a taxi cab driver throughout his decision in supporting his finding that Plaintiff was disabled.  ECF Dkt. #16 at 13-14.  She contends that the ALJ misconstrued her testimony concerning her work as a taxi cab driver and erroneously used this as a primary basis in which to deny her benefits.  *Id*.

In order to be eligible for DIB, a claimant must have coverage, that is, be fully insured, at the time of her disability.  42 U.S.C. § 423(a)(c); 20 C.F.R. § 404.101(a).  The period of coverage ends on the date last insured, which is the last day that a claimant is eligible for DIB.  *Id*.  In order to be entitled to DIB, a claimant must be "under a disability" within the meaning of the Social Security

Act as of the date her insured status expired.  42 U.S.C. § 423(a)(1)(E), 42 U.S.C. § 423(d); 20 C.F.R. § 404.131(a); 404.320(b)(2).

At Step One of the sequential evaluation to determine entitlement to DIB, an individual who is working and engaged in substantial gainful activity is not entitled to disability benefits.  42 U.S.C. § 423(f); *Bell v. Comm'r of Soc. Sec.*, 105 F.3d 244, 245 (6th Cir. 1996).  If an ALJ finds that a claimant is working and engaging in substantial gainful activity, she will not be found to be "disabled" and the ALJ ends the sequential evaluation at this Step.  20 C.F.R. §§ 404.1520(a)(4)(i) and (b).  The burden rests with Plaintiff to show that she was not engaging in substantial gainful activity.  *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387 (6th Cir. 2004).

In this case, the ALJ noted at Step One Plaintiff's testimony that she drove a taxi cab for one or two years up until a few months prior to the hearing.  Tr. at 27.  He further noted that at another point in her testimony, Plaintiff indicated that she drove a cab for four or five years.  *Id*.  He indicated that Plaintiff worked three 13-hour shifts a week and earned $75.00 to $100.00 per shift as per her own testimony.  *Id*.  There was a discrepancy in the amount of shifts and times that Plaintiff worked driving a taxi, with Plaintiff first indicating that she was working thirteen-hour days three days per week.  *Id*. at 59.  Later in the hearing, however, the ALJ asked Plaintiff if she was consistently working thirteen-hour shifts three days a week and she said "[n]ot really, no.  Maybe - - it just - - it's really tiring and it's very - - it took a toll out of my body."  *Id*. at 70.  The ALJ then asked how many weeks per four- week month that she would work and she responded two to three weeks per month if she could.  *Id*.  at 70-71.  She then responded to the ALJ's question whether she always worked thirteen-hour shifts by stating, "Yes, ten and a half."  *Id*. at 71.  He then clarified, "[s]o ten and a half to thirteen hour shifts" "two to three weeks per month" and she responded affirmatively.  *Id*.  ECF Dkt. #12 at 50.

The ALJ did not mention the latter testimony in his Step One analysis.  However, the undersigned recommends that the Court find that it is not relevant because the ALJ ultimately found Plaintiff's testimony concerning her taxi driving to be vague and thereafter continued his sequential analysis and proceeded to Step Two.  *Id*.

-14-

Plaintiff also challenges the ALJ's comment in his Step One analysis that while he was not using her taxi driving as substantial gainful activity at Step One, he was going to use this a factor in his credibility analysis. ECF Dkt. #16 at 12-13. The ALJ did indicate that this testimony was "an important credibility that is discussed throughout this opinion." Tr. at 28. However, the ALJ did not use this fact as a "primary basis" to deny her benefits as Plaintiff argues. The first time that the ALJ referred to Plaintiff driving a taxi is when he concluded that she had only moderate limitations in maintaining concentration, persistence or pace. *Id*. at 30. He asserted that the fact that she drove a taxi for as long as she did after her alleged onset date showed that she was not as limited in concentration, persistence or pace as she alleged. *Id*. The ALJ also referred to Plaintiff driving a taxi in his credibility determination when he found that Plaintiff was driving a taxi "on a full-time basis" when her cervical spine x-ray from February 2008 showed DDD with only mild narrowing of the foramens. *Id*. at 31. Whether Plaintiff worked full-time or part-time after her alleged onset date, the ALJ could consider this in his credibility determination. *See Miller v. Comm'r of Soc. Sec.*, No. 12-3644, 524 Fed. App'x 191, 194, 2013 WL 1705026, at **2 (6th Cir. Apr. 22, 2013), unpublished, citing 20 C.F.R. §§ 404.1529(c)(3), 404.1571, 416.929(c)(3), 416.971. He also noted that Plaintiff made inconsistent statements as she did not report in any of her disability applications that she drove a taxi after her onset date. *Id*. Finally, the ALJ referred to Plaintiff driving a taxi when he decided not to adopt Dr. Caldwell's fingering limitation because Plaintiff was able to drive a taxi cab. *Id*. at 32-33. These are proper considerations for the ALJ. *See Bridges v. Comm'r of Soc. Sec.*, 2011 WL 1113442 (N.D. Ohio, Jan. 12, 2011), unpublished (the regulations do not preclude the ALJ from considering Plaintiff's work activities as part of daily activities).

Since the ALJ did not find that Plaintiff engaged in substantial gainful activity at Step One and reasonably considered Plaintiff's ability to drive a taxi cab as one factor in his credibility analysis, the undersigned recommends that the Court find no merit to Plaintiff's first assertion of ALJ error.

**B.     STEP TWO**

Plaintiff also contends that the ALJ failed to consider her well-documented impairments of hand arthritis, fibromyalgia, headaches and postural orthostatic tachycardia syndrome ("POTS") as

-15-

severe in his Step Two analysis. ECF Dkt. #16 at 14. Defendant asserts that substantial evidence supports the ALJ's decision not to find these impairments severe and even if it did not, reversible error did not occur because the ALJ found some impairments severe and proceeded onward through the sequential analysis. ECF Dkt. #18 at 9-12.

At Step Two, the ALJ determines whether a claimant's impairments are severe and whether they meet the twelve-month durational requirement. 20 C.F.R. § 404.1520(a). At this Step, the claimant bears the burden of proving the threshold requirement of a "severe impairment." *Higgs v. Bowen*, 880 F.2d 860, 863 (6ᵗʰ Cir. 1988). The claimant must also show that she suffered from a medically severe impairment or impairments that lasted or could be expected to last for a continuous period of at least twelve months. *Id.* The Court must apply a de minimis standard in determining severity at Step Two. *Id.* at 862. An impairment or combination of impairments is not severe "...if it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). The types of "basic work activities" that qualify for use in the regulations are described in 20 C.F.R. §404.1521(b). An impairment can be found non-severe only if it could constitute "a slight abnormality which has such a minimal effect on the individual that it could not be expected to interfere with an individual's ability to work, irrespective of age, education and past work experience." *Farris v. Sec'y of Health and Human Servs*., 773 F.2d 85, 89-90 (6ᵗʰ Cir. 1985). The goal of Step Two is to screen out totally groundless claims. *Id.* at 89.

In order to establish eligibility for disability benefits, a claimant must establish that she became disabled prior to the expiration of her insured status. *See* 42 U.S.C. § 423(c) (1); *Moon*, 923 F.2d at 1182; *Higgs*, 880 F.2d at 862. Accordingly, "as a general rule, the only medical evidence relevant to the issue of disability is that medical evidence dealing with a claimant's condition during the period of insured status." *Carter v. Comm'r of Soc. Sec.,* No. 5:12CV2321, 2013 WL 3940874, at *6 (N.D. Ohio, July 30, 2013), quoting *Forshee v. Comm'r of Soc. Sec*., 2012 WL 1672974 at * 8 (E.D.Mich. April 11, 2012). The Sixth Circuit has held that "[e]vidence of disability obtained after the expiration of insured status is generally of little probative value." *Strong v. Soc. Sec. Admin*., 88 Fed. Appx. 841, 845 (6ᵗʰ Cir .2004). Medical evidence of new developments in a claimant's condition is generally not relevant, unless the evidence "relates back" to the claimant's limitations

prior to the date last insured. *See Higgs*, 880 F.2d at 863; *Bagby v. Harris*, 650 F.2d 836 (6ᵗʰ Cir. 1981).

The undersigned recommends that the Court find that the ALJ's determination that Plaintiff's hand arthritis, headaches, fibromyalgia[1] and POTS were not severe is not reversible error. *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6ᵗʰ Cir. 1987("[s]ince the Secretary properly could consider claimant's cervical condition in determining whether claimant retained sufficient residual functional capacity to allow him to perform substantial gainful activity, the Secretary's failure to find that claimant's cervical condition constituted a severe impairment could not constitute reversible error.").  In the instant case, the ALJ found Plaintiff's osteoarthritis, DJD in the knees, cervical DDD, mood disorder, cannabis abuse in remission and Sjogren's Syndrome to be severe impairments. Tr. at 28.  Accordingly, the ALJ proceeded onward to the rest of the steps in the sequential analysis and considered Plaintiff's non-severe impairments of hand arthritis, headaches, fibromyalgia and POTS in the rest of his analysis, including the RFC. The ALJ even stated as much, indicating that even if he had found those impairments to be severe, the RFC that he determined would not change.  *Id*. at 29.

As the ALJ pointed out, Plaintiff's abilities to drive a taxi cab and make jewelry during the relevant time period contradicted a finding that her hand impairments were severe. Tr. at 28.  He also considered Dr. Cohn's finding of fair grip strength in March of 2010, testing conducted by Dr. Cohn the month prior showing normal results, and Dr. Gerbich's normal findings.  *Id*.  The ALJ also noted x-rays showing only "early arthritic disease."  *Id*.  He noted that Plaintiff testified to having headaches every three or four days of intense severity, fibromyalgia was suspected in March of 2008 and Dr. Gerblich noted Plaintiff's complaints of lupus and migraine headaches when he examined her for the agency and found totally normal results.  *Id*. at 31-32.  He also cited to and relied upon

---

[1] The undersigned points out an error in the ALJ's Step Two finding that only 2 of 18 tender points were found in September of 2011 and no testing existed in the record to confirm a diagnosis of fibromyalgia. Tr. at 29.  The record shows that on February 12, 2008, Dr. Manzon found 16 of 18 tender points upon examination of Plaintiff.  *Id*. at 337.  This record is only one page away from the page cited by the ALJ to find that testing failed to show any problems with Plaintiff's hands and that Dr. Manzon believed that pain amplification behavior was present.  *Id*. at 31, citing Tr. at 338.

-17-

the findings of agency reviewing physician Dr. Caldwell, who considered Plaintiff's primary diagnosis of lupus and her secondary diagnosis of migraine headaches.  *Id*. at 32-33.

Since the ALJ proceeded onward in the sequential analysis and appears to have considered the non-severe impairments in the subsequent steps of his analysis, the undersigned recommends that the Court find that reversible error did not occur when the ALJ found that Plaintiff's hand arthritis, headaches, fibromyalgia and POTS were not severe impairments at Step Two.

### C.    STEP THREE

Plaintiff further asserts that the ALJ erred in failing to find that her spinal impairment did not meet or equal Listing 1.04(A).  ECF Dkt. #16 at 17-19.  The undersigned recommends that the Court remand this case for further evaluation and analysis of Step Three by the ALJ.

The Listing of Impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 describes impairments for each of the major body parts that are deemed of sufficient severity to prevent a person from performing gainful activity.  20 C.F.R. § 416.920.  In the third step of the analysis to determine a claimant's entitlement to disability insurance benefits, it is the claimant's burden to bring forth evidence to establish that her impairments meet or are medically equivalent to a listed impairment.  *Evans v. Sec'y of Health & Human Servs*., 820 F.2d 161, 164 (6th Cir. 1987).  In order to meet a listed impairment, the claimant must show that her impairment meets all of the requirements for a listed impairment.  *Hale v. Sec'y,* 816 F.2d 1078, 1083 (6th Cir. 1987).  An impairment that meets only some of the medical criteria and not all does not qualify, despite its severity.  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

An impairment or combination of impairments is considered medically equivalent to a listed impairment "* * *if the symptoms, signs and laboratory findings as shown in medical evidence are at least equal in severity and duration to the listed impairments."  *Land v. Sec'y of Health and Human Servs*., 814 F.2d 241, 245 (6th Cir.1986)(per curiam).  Generally, an ALJ should have a medical expert testify and give his opinion before determining medical equivalence.  20 C.F.R. § 416.926(b). In order to show that an unlisted impairment or combination of impairments is medically equivalent to a listed impairment, the claimant "must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment."  *Sullivan*,  493 U.S. at 531.

-18-

Listing 1.04(A) provides:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

Listing 1.04(A).

Plaintiff correctly points out that a February 1, 2008 cervical x-ray established that she had DDD as it showed DDD at C3/C4 with osteophyte formation of multiple endplates in the lower cervical spine.  Tr. at 313.  As to the compromise of a nerve root or the spinal cord, with evidence of nerve root compression, Plaintiff was involved in a car accident on August 3, 2011 and a cervical MRI performed on October 6, 2011 showed a prominent central disc protrusion at C3-C4 which caused indentation and deformed the ventral aspect of the cervical cord.  *Id.* at 1021.  The MRI also showed a small area that was suggestive of myelomalacia within the cervical cord adjacent to a prominent central C3/C4 disc.  *Id.*  Dr. Schaefer, an orthopedist, reviewed this MRI on March 28, 2012 and stated that he could clearly see "central disc protrusion at C3-4 with nearly complete compression of the surrounding CSF and deformity of the cord, but the intrinsic cord signal is still small - 1 cm just above and right of C3-4 disc."  *Id.* at 1097.  From this MRI, he diagnosed cervical disc protrusion with myelopathy.  *Id.*  Although his notation was written after the ALJ's decision, he opined that the car accident of August 3, 2011 caused the C3-4 disc protrusion and thus the spinal cord myelopathy, as well as aggravated Plaintiff's pre-existing spondylosis at C4-C5 through C6-C7. *Id.* at 1098.  He further indicated that Plaintiff was scheduled for surgery in 5-6 weeks with Dr. Orr but he was going to call and see if the date could be moved up as he believed that she needed a cervical decompression and fusion.  *Id.*  Dr. Schaefer further opined that, "[t]hese problems combined with her know[sic] knee djd (moderate med jt space narrowing in 2008), post-surgical and degenerative changes in feet and ankles, chronic headaches, makes this problem disabling.  It is probably that she will be unemployable for at least 12 months, and I would support her application for SSD benefits."  *Id.*

-19-

The ALJ's Step Three findings as to Plaintiff's cervical impairments in this case are similar to those in *Reynolds v. Commissioner of Social Security*, 424 Fed. App'x 411 (6th Cir. 2011).  In *Reynolds*, the Sixth Circuit Court of Appeals reversed and remanded the case when the ALJ found that the claimant had severe physical and mental impairments at Step Two of the sequential analysis but failed to analyze the claimant's back impairment at Step Three despite concluding that his back impairment had failed to meet or equal a Listing.  The Sixth Circuit noted that while the ALJ had thoroughly addressed the claimant's severe mental impairments in his Step Three analysis, " '[n]o analysis whatsoever was done as to whether Reynolds' physical impairments (all summed up in his finding of a severe 'back pain' impairment) met or equaled a Listing under section 1.00, despite his introduction concluding that they did not." *Id.* at 415.  The Sixth Circuit found that:

> In short, the ALJ needed to actually evaluate the evidence, compare it to Section 1.00 of the Listing, and give an explained conclusion, in order to facilitate meaningful judicial review.  Without it, it is impossible to say that the ALJ's decision at Step Three was supported by substantial evidence.

*Id.* at 416 [citations omitted].

Courts within this District have recently applied *Reynolds* in cases where the ALJ provided only a conclusory statement and no analysis at Step Three in finding that a claimant's physical impairments did not satisfy a Listing.  *See e.g., Shea v. Comm'r of Soc. Sec.*, No. 1:11CV1076, 2012 WL 967072 (N.D. Ohio Mar. 21, 2012) (Adams, J.), adopting *Shea v. Astrue*, No. 1:11CV1076, 2012 WL 967088 (N.D. Ohio Feb. 13, 2012)(case reversed and remanded where ALJ offered no analysis at Step Three to support his conclusory statement that claimant's physical impairments did not meet a Listing); *Keyes v. Astrue,* 2012 WL 832576, at *6 (N.D. Mar. 12, 2012)(Gwin, J.)(addressing claimant's objection to Report and Recommendation and finding that ALJ failed to evaluate physical impairments at Step Three even though claimant had not raised the issue in her brief to United States Magistrate Judge); *see also May v. Astrue*, No. 4:10CV1533, 2011 WL 3490229 (N.D. Ohio Aug. 10, 2011) (Adams, J.), adopting *May v. Astrue*, No. 4:10CV1533, 2011 WL 3490186, at *9 (N.D. Ohio June 1, 2011)(same).

Similarly in this case, while the ALJ stated in his decision that he specifically considered Listing 1.04, he provides no analysis of the medical evidence to show how he reached his conclusion

that Plaintiff's cervical impairments did not meet or equal a Listing, or how or why Plaintiff's impairments in combination did not medically equal a Listing.  Nor did the ALJ have a medical expert at the hearing.  And although Dr. Schaefer's opinions and findings post-date the ALJ's opinion, the October 6, 2011 MRI does not and Dr. Schaefer clearly concludes that the cervical impairments related back to Plaintiff's August 3, 2011 car accident.  Tr. at 1097-1098.  The ALJ makes no mention of the October 6, 2011 MRI in his decision.

Accordingly, the undersigned recommends that the Court find that the ALJ failed to adequately articulate the reasons for reaching his conclusion that Plaintiff's cervical impairments did not meet or equal Listing 1.04(A).  Nor did he compare the requirements of that Listing with the medical evidence.  And he failed to articulate why Plaintiff's impairments in combination failed to equal a Listing.

### D.    RFC

Plaintiff also asserts that the ALJ erred in determining her RFC.  ECF Dkt. #16 at 19-21. However, the undersigned declines to address this assertion because the ALJ's Step Three analysis may impact his findings as to this issue in his subsequent steps in the analysis.  *See Reynolds*, 424 Fed. App'x at 417.

## VII.    CONCLUSION AND RECOMMENDATION

For the foregoing reasons, the undersigned recommends that the Court REVERSE the ALJ's decision and REMAND the instant case for further factfinding, analysis, and articulation regarding whether Plaintiff's cervical impairments meet or equal a Listing and whether all of her impairments in combination meet or medically equal a Listing.


DATE: August 12, 2014

                                                    ___*/s/George J. Limbert*_____
                                                    GEORGE J. LIMBERT
                                                    UNITED STATES MAGISTRATE JUDGE

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of receipt of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See, United States v. Walter,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985); and Local Rule 72.3.